

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| MEDELEZ, INC., an Oregon Corporation, | ) | |
| | ) | No.  36225-6-III (consolidated |
| Respondent, | ) | with 36335-0-III) |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| DEPARTMENT OF EMPLOYMENT | ) | UNPUBLISHED OPINION |
| SECURITY, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

FEARING, J. —

 *Nothing uses up alcohol faster than legal argument.*  Paraphrase of
Robert A. Heinlein

This court is the fourth, and conceivably not the last, body to resolve whether

Jeffrey Metzener qualifies for unemployment compensation on his termination from

employment from Medelez, or, alternatively whether his drinking alcohol on a day off

work as a truck driver and his flunking an alcohol screen that day disqualifies him from

benefits. The law demands that we review the highest administrative officer, the

Employment Security Department (ESD) commissioner, when resolving the appeal.

Because substantial evidence supports the commissioner's ruling, we affirm the

commissioner's grant of benefits and thereby reverse the superior court.

FACTS

This appeal concerns whether Jeffrey Metzener, an employee of Medelez Inc.

(Medelez), committed employment misconduct that disqualifies him for unemployment

benefits after his September 2016 termination from employment with Medelez. Metzener

began work as a truck driver with Medelez on February 15, 2016, but the facts begin

earlier.

In November 2015, Jeffrey Metzener applied for a job with another employer, but

tested positive for marijuana on a November 20 pre-employment drug screen. As a

result, the employer did not hire him. In order to preserve his commercial driver's

license (CDL) needed to drive a truck, the Department of Licensing required Metzener to

undergo a substance evaluation and comply with a substance abuse plan issued as a result

of the evaluation. As a result of his evaluation, substance abuse professional William

Ellis, Jr. prepared a two-page substance abuse plan, which read, in part:

> My recommendations were as follows: to complete an eight to
> twelve-hour alcohol/other drug information school [(ADIS)] at a state
> certified agency within the next 30 days.
> On December 5th, 2015 a face-to-face return to duty evaluation was
> performed. It has been confirmed that Mr. Metzener completed the above

recommendation at ADIS on December 5th, 2015. Therefore, [he] has satisfactorily complied with my recommendation. Mr. Metzener may return to safety sensitive duties once he produces a negative return-to-duty screen and has received reinstatement of his CDL. He should have reinstatement by no later than December 12th, 2015. If he does not have his CDL by that time he will need to contact me, and it will be released that day.

For Mr. Metzener to remain in compliance with his SAP [substance abuse plan] he will need to abide by the following:

[(1)] Remain abstinent from all mind/mood altering chemicals except when prescribed by a physician. If he is prescribed such medication, he will be responsible of informing his supervisor with verification of the mind/mood altering medication. . . .

[(2)] Mr. Metzener, must complete the minimum, of six DOT follow-up drug screens within the next twelve months of performing safety sensitive duties. The actual amount of tests may be more than six. You, the Employer, will receive a separate letter outlining the follow-up plan."

[(3)] If Mr. Metzener is laid off from performing safety sensitive duties, he will not have to perform follow-up urine screens. When he returns to safety sensitive duties the return to duty drug testing will resume from where it left off. Mr. Metzener will be subject to follow-up testing for up to sixty (60) months of performing safety sensitive duties. DOT [Department of Transportation] follow-up testing is in addition to any other testing he would be required to complete. These DOT follow-up tests are to be unpredictable and unannounced. Once Mr. Metzener is notified to submit to a DOT follow-up drug screen, he will have three (3) hours to complete the process.

Clerk's Papers (CP) at 56-57, 126 (boldface and underline omitted).

Medelez claims that, as a result of the positive marijuana testing, the State immediately revoked Jeffrey Metzener's commercial driver's license and the State would not reinstate the license until he passed a return to duty screen. William Ellis' substance abuse plan supports this factual contention, but no other evidence confirms the assertion. In a response to Metzener's application for unemployment compensation, Medelez

3

impliedly declared that the State had not revoked Metzener's CDL at the time of his positive marijuana drug screen. Medelez wrote that Metzener's "CDL license will be suspended within 2 weeks" from either the date of Metzener's termination from employment with Medelez or the later date of the response. CP at 128.

When applying for employment with Medelez in February 2016, Jeffrey Metzener informed Medelez of his November 2015 drug screen positive result and handed Medelez a copy of his substance abuse plan. Metzener passed a February 2016 drug screen before beginning his employment with Medelez. Metzener believed this screening constituted his return-to-duty test required under the substance abuse plan.

On Jeffrey Metzener's hire, employer Medelez maintained a policy requiring employees to submit to random urine drug testing. The policy declared:

> Any employee or perspective employee is required to, um, submit to pre-employment, random, post accident . . . testing, um, that we require or it needs to be done. Uh, refusal to take a test. Um, or a tampering with a sample will result in termination.
> . . . [I]f at any time, an employee tests positive for controlled substance . . ., [it] will result in a decision not to hire or a termination from employment if already employed. A positive test conducted on a current employee will result . . .—with the employee being suspended from work immediately for a period of time. . . .
> . . . The employee must understand and agree that he or she is subject to do a urine drug screen test at any time for continued employment.

CP at 52-53. The policy did not reference alcohol or a breathalyzer. Medelez never informed Jeffrey Metzener that he could not drink alcohol off duty. Medelez never specified whether it would test employees for any substance while off-duty.

4

By September 2016, after seven months of employment, Medelez had not yet directed Jeffrey Metzener to submit to any follow-up drug screens mentioned in the substance abuse plan. Metzener was curious as to the lack of any screening. On some unknown date in September, Metzener told Medelez's recently hired safety and compliance manager, Dawn Fischer, that he had worked for Medelez for seven months and Medelez had yet to schedule a drug screening. Metzener and Fischer agreed to the need of follow-up testing. Fischer instructed Metzener to deliver another copy of his substance abuse plan to her office because she could not locate the first copy. According to Metzener, he did so.

During the same month, Jeffrey Metzener experienced debilitating back pain, which limited his ability to perform some job duties. Metzener informed Dawn Fischer and his supervisor, Mario Rodriguez, about his back problems, and the two afforded him assistance for some difficult tasks. An emergency room doctor prescribed Metzener pain medication. Metzener ingested the medications in limited quantities before sleep since the medication interfered in safe driving.

On September 21, 2016, Jeffrey Metzener informed Dawn Fischer and Mario Rodriguez that he needed surgery for his back and his recovery from the surgery would temporarily prevent him from work duties. Metzener's surgery was scheduled for September 29, 2016. Metzener told Rodriguez that he could return to work two weeks

5

after the surgery. No evidence suggests that Fischer or Rodriguez then told Metzener that he could not be working anyway because he lacked a valid CDL.

On September 21, 2016, Jeffrey Metzener worked his scheduled shift. Before departing the workplace on September 21, Mario Rodriguez took from Metzener the keys to the Medelez truck that Metzener drove. Rodriguez informed Metzener that Medelez would not permit him to drive until further notice. Since Rodriguez provided no explanation for seizing the keys, Metzener concluded that Medelez placed him on a leave of absence because of his disability and upcoming surgery and that Medelez did not expect him to return to work until after he recovered from surgery. Metzener believed he would not return to work until October 11. No Medelez employee told Metzener that Rodriguez took the keys because Metzener had failed to undergo a return to duty drug screening.

On September 21, Mario Rodriguez also told Jeffrey Metzener to telephone safety coordinator Dawn Fischer, which action Metzener promptly took. During the September 21 conversation, Dawn Fischer informed Jeffrey Metzener that he needed to complete his return-to-duty drug screen before returning to work. Fischer labeled the drug screen Metzener underwent at the start of his employment with Medelez as a "pre-employment" test. CP at 59. The return-to-duty test differs from a pre-employment test in that someone must observe the employee urinate for a return-to-duty test, but not a pre-employment test.

6

Even before the taking of his company truck keys on September 21, Jeffrey Metzener had gained approval from Medelez to miss work on September 22 because of a medical appointment. On September 22, Metzener, during lunch with his wife, drank two alcoholic beverages. He never expected to be tested for his blood alcohol level that day. Medelez had never told Metzener that he could not drink alcohol on days he did not work.

On September 22, Dawn Fischer searched for a copy of Jeffrey Metzener's substance abuse plan, but could not locate a copy in Medelez's offices. We do not know if Fischer's search meant that Metzener had not earlier given her another copy or that Fischer lost the second copy. Anyway, Fischer contacted William B. Ellis, Jr., Jeffrey Metzener's substance abuse plan evaluator, for another copy of the plan. Ellis then asked Fischer to direct Metzener to submit to a return to duty test.

Dawn Fischer telephoned Jeffrey Metzener and directed him to report to a testing facility for his return to duty screening. Because he had just drank alcohol, Metzener asked to postpone the test. Fischer denied the request because she believed federal regulations prohibited rescheduling. Metzener reported to the testing facility, where he provided a urine specimen and underwent a Breathalyzer test. Metzener's drug screen from his urine sample was negative, but the Breathalyzer tests respectively showed a blood alcohol content of 0.051 and 0.049.

Medelez assumed that the Department of Licensing would suspend Jeffrey

7

Metzener's CDL because of the breathalyzer test result. This assumption may be inconsistent with Medelez's claim that Metzener never possessed a valid CDL while employed with Medelez. According to Medelez's Dawn Fischer, an employee who fails a breathalyzer test must begin a new substance abuse program in order to reinstate his CDL. On September 26, Medelez terminated Metzener's employment.

After termination from employment, Jeffrey Metzener applied for unemployment insurance benefits. In a questionnaire Metzener completed for the ESD, one question asked:

> What was the final incident that caused you to be fired or suspended?

CP at 97. Metzener responded:

> Laid off due to back injury 9-20-16—Terminated due to positive Breath (return to duty) alcohol test 9-22-16.

CP at 97. The ESD denied Metzener's application, while finding that Medelez fired Metzener for "work-connected misconduct" because he violated the employer's substance abuse testing policy. CP at 90.

## PROCEDURE

Jeffrey Metzener appealed ESD's denial of unemployment benefits to ESD's office of administrative hearings. An administrative law judge (ALJ) conducted a telephonic hearing. During the administrative hearing, Dawn Fischer, on behalf of Medelez, offered as an exhibit page two, but not page one, of William Ellis' substance

8

abuse plan. When asked about the content of the first page, Fischer read the page into the record.

During the December 5 hearing, Dawn Fischer testified that Medelez terminated the employment of Jeffrey Metzener because he failed "the alcohol test portion of a return to duty status test per his SAPs [substance abuse plan's] instructions." CP at 50. She forwarded no other basis for discharge from employment.

ALJ Aaron Naccarato ruled that Medelez fired Jeffrey Metzener for misconduct as defined in RCW 50.04.294(1)(a). The ALJ thereby affirmed ESD's initial determination denying benefits. In so ruling, the ALJ remarked in his written order:

> The undersigned concludes that the employer's witness' testimony is a more credible with regard to those facts set forth above. The undersigned gives a great deal of weight to the testimony of Dawn Fischer.

CP at 17.

Jeffrey Metzener appealed the ALJ's decision to the ESD's commissioner. The commissioner found that Metzener lacked reason to know that his substance abuse plan prohibited off-duty consumption of alcohol. As a result, the commissioner ruled that Medelez failed to meet its burden to show that Metzener engaged in misconduct, and the commissioner granted Metzener unemployment benefits. Part of the commissioner's decision reads:

> Here, the claimant has unequivocally denied that he had reason to know that off-duty alcohol consumption was prohibited, and evidence of record does not establish otherwise. First, neither the substance abuse plan

9

nor testimony of the claimant's substance abuse professional (William Ellis, Jr.) regarding the terms—much less specific instructions provided to the claimant—was presented by the employer. It is noted the plan initiated when a pre-employment test for another employer was positive for marijuana use but does not clearly establish that alcohol was an issue. Plan-related provisions were referenced in a letter (at best, hearsay evidence) that was read into the record by one of the employer's witnesses but did not specifically address off-duty consumption of alcohol. In addition, although the claimant readily admits that he consumed alcohol prior to an unscheduled off-duty test, evidence does not establish the claimant drove a vehicle after doing so, much less while under the influence of alcohol. Moreover, at the time of the test, evidence indicates the claimant did not anticipate he would be able to return to duty for a few weeks (due to a medical issue). In sum, based on evidence of record (or lack thereof), we are not persuaded the claimant had reason to know that his September 22, 2016 off-duty consumption of alcohol was prohibited.

CP at 23. In her ruling, the commissioner added:

The primary question is whether the claimant had reason to know that off-duty consumption of alcohol was prohibited under the terms of his substance abuse plan. As discussed above, the claimant's testimony—that he had not been told off-duty alcohol consumption was prohibited—was not refuted. Having decided to require a return to duty test on a day when the claimant was off-duty, the test result presented the employer with a significant dilemma. Given suspension of the claimant's CDL, the employer's decision to terminate the employment relationship is not questioned. However, for purposes of unemployment benefit eligibility, misconduct has not been established.

CP at 26.

Employer Medelez appealed the ESD commissioner's ruling to the superior court. On appeal, Medelez argued that Jeffrey Metzener engaged in willful misconduct when he willfully consumed alcohol after Dawn Fischer warned him of the testing and this conduct disqualified him from employment security benefits under

10

RCW 50.04.294(1)(a). Medelez also asserted that Metzener's imbibing of alcohol constituted negligent disregard for his employer's interest and thereby disqualified him for unemployment compensation under RCW 50.04.294(1)(d). The superior court agreed with Medelez, reversed the ESD commissioner's ruling, and denied Jeffrey Metzener unemployment benefits.

LAW AND ANALYSIS

Both Jeffrey Metzener and the ESD appeal the superior court's decision to reverse the department commissioner's ruling granting Metzener unemployment benefits. Both appellants assert the same arguments such that we hereafter refer to Metzener as the sole appellant.

The Administrative Procedure Act (APA), chapter 34.05 RCW, governs the review of final agency decisions by an appellate court. *Darkenwald v. Employment Security Department*, 183 Wn.2d 237, 244, 350 P.3d 647 (2015). Contrary to the process in most appeals, this court does not review the superior court decision. Following review by a superior court acting in its appellate capacity, a Court of Appeals sits in the same position as the superior court and applies the APA standards directly to the administrative record. *Campbell v. Employment Security Department*, 180 Wn.2d 566, 571, 326 P.3d 713 (2014).

The first two sentences of RCW 34.05.464 declare:

(4) The officer reviewing the initial order (including the agency head

11

> reviewing an initial order) is, for the purposes of this chapter, termed the reviewing officer. The reviewing officer shall exercise all the decision-making power that the reviewing officer would have had to decide and enter the final order had the reviewing officer presided over the hearing, except to the extent that the issues subject to review are limited by a provision of law or by the reviewing officer upon notice to all the parties.

Thus we evaluate the review judge's final order, not the initial order entered by the ALJ. *Tapper v. Employment Security Department*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993); *Crosswhite v. Department of Social & Health Services*, 197 Wn. App. 539, 548, 389 P.3d 731, *review denied*, 188 Wn.2d 1009, 394 P.3d 1016 (2017). Medelez and Metzener's review judge was the ESD commissioner. When the ALJ and the review officer enter contradictory findings, we do not accord the deference to the ALJ that we would accord to the trier of fact in a nonadministrative matter, because the review officer has broad decision-making authority and is intended to bring the agency's expertise to bear. *Crosswhite v. Department of Social & Health Services*, 197 Wn. App. at 548. Our conclusion that we review the ESD commissioner's factual findings, not the ALJ or the superior court's rulings, bears critical importance.

Before addressing the merits of Jeffrey Metzener's application for unemployment benefits, we must determine the facts on which we base our ruling. In doing so, we address several arguments raised by Medelez.

*Issue 1: Whether the ESD commissioner refused to consider the substance abuse plan or improperly downplayed the import of the plan on the basis of hearsay?*

12

*Answer 1: No.*

Employer Medelez complains that the ESD commissioner rejected William Ellis'

substance abuse plan for Jeffrey Metzener as an exhibit and thereby erroneously refused

to consider relevant evidence. We disagree.

Medelez references a sentence in the commissioner's ruling that read:

> Plan-related provisions were referenced in a letter (at best, hearsay evidence) that was read into the record by one of the employer's witnesses but did not specifically address off-duty consumption of alcohol.

CP at 23. This passage correctly characterizes the substance abuse plan as hearsay

evidence since, at the evidentiary hearing, the author never identified the plan nor did any

witness qualify the plan as a business record. Medelez correctly notes that an

administrative adjudicator may admit hearsay evidence at an administrative hearing if the

presiding officer determines that a reasonably prudent person would rely on the evidence

in the conduct of his or her affairs. RCW 34.05.452. Nevertheless, the commissioner did

not rule that the ALJ improperly admitted the plan as an exhibit or that the ALJ

erroneously listened to Dawn Fischer read the missing first page of the plan into the

record. The commissioner also did not rule that she would not consider the contents of

the plan.

In the alternative, Medelez objects to the ESD commissioner allegedly

downplaying the significance of the substance abuse plan because of the commissioner's

reference to the plan being hearsay. Nevertheless, Medelez does not explain how the

13

commissioner purportedly speciously snubbed the plan's importance such that the commissioner rendered a mistaken decision. To the contrary, the entire ruling of the commissioner shows that the commissioner recognized the full contents of the plan, including the substance of the missing page. The sentence of the commissioner's ruling highlighted by Medelez merely states the obvious—the substance abuse plan does not mention or prohibit consumption of alcohol while off duty. The commissioner employed the absence of language in her opinion. Regardless, as explained later, the commissioner, not this court, holds the prerogative to weigh the evidence and thereby decide what evidence holds priority when issuing a ruling.

*Issue 2: Whether the ESD commissioner erroneously failed to afford the ALJ deference as to the credibility of the witnesses and the facts?*

*Answer 2: No.*

Medelez claims error in the ESD commissioner's ruling because the commissioner failed to defer to the ALJ's findings and to accede to the ALJ's weighing of the witnesses' credibility. Medelez impliedly asks this court to rely on the ALJ's determinations, not the commissioner's rulings, when Medelez observes in its brief that the ALJ listened live to the witnesses' testimony and, to paraphrase Medelez, the commissioner only reviewed a frozen record. Medelez asserts that the commissioner did not listen to oral testimony, while the ALJ fashioned his judgments of credibility based on personal evaluations. In the ALJ's view, employer witnesses outshined Jeffrey

14

Metzener.  Medelez's observations fail, however, to consider that the ALJ did not observe the demeanor of the witnesses when they testified since the evidentiary hearing transpired by telephone.

Medelez emphasizes the last sentence in RCW 34.05.464(4).  This sentence declares:

> In reviewing findings of fact by presiding officers, the reviewing officers shall give due regard to the presiding officer's opportunity to *observe* the witnesses.

(Emphasis added.)  We question the applicability of the provision directing the administrative review officer to give due regard to the ALJ's findings of fact in this appeal.  Because Jeffrey Metzener's ALJ conducted a telephonic hearing, the ALJ did not directly observe the witnesses.  The ALJ did not see the witnesses' facial expressions nor other demeanor during their respective testimony.

*Black's Law Dictionary* defines "observe," in relevant part, as:

> observe *vb.* 1. To watch carefully <the police observed his movements for two hours>.

BLACK'S LAW DICTIONARY 1246 (10th ed. 2014).  The Washington rule directing appeals courts to defer to a trial judge or jury's factual findings follows from the recognition that the fact finder observed and evaluated witnesses' demeanor.  *State v. Swan*, 114 Wn.2d 613, 666, 790 P.2d 610 (1990).  The trial judge or jury "alone had the opportunity to view the demeanors of those testifying."  *State v. Alvarez*, 45 Wn. App.

15

407, 413, 726 P.2d 43 (1986). The jury "observed the witnesses testify firsthand." *State v. McCreven*, 170 Wn. App. 444, 477, 284 P.3d 793 (2012). According to one treatise the reason for deferring to the initial hearing officer's findings follows from the officer observing witnesses' demeanor. 2 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 11.2, at 992 (5th ed. 2010).

We recognize that the Medelez and Metzener ALJ listened live to the testimony of the witnesses such that he could hear the inflection and any hesitation in the witnesses' respective speech. But the tone and cadence of voice is only one of many measures of demeanor. Also, the ESD commissioner could listen to the audio recording of the testimony and hear the same noises as did the ALJ.

In the end, this court does not substitute its judgment on witnesses' credibility or the weight to be given conflicting evidence for the judgment of the ESD commissioner, not the ALJ. *DeFelice v. Employment Security Department*, 187 Wn. App. 779, 787, 351 P.3d 197 (2015); *Western Ports Transportation, Inc. v. Employment Security Department*, 110 Wn. App. 440, 449, 41 P.3d 510 (2002). Even if we concluded that the commissioner should have afforded some deference to the ALJ's findings, we, as discussed later, would still uphold the commissioner's findings. The documents that speak for themselves support the commissioner's ruling. Medelez submitted no testimony that disagreed with the commissioner's critical findings.

*Issue 3: Did substantial evidence support the ESD commissioner's findings of fact?*

*Answer 3: Yes.*

Pursuant to the APA, a party may obtain judicial relief from an agency order in nine enumerated circumstances. RCW 34.05.570(3)(a)-(i). Medelez relies on two of the nine grounds. Medelez argues that the ESD commissioner erroneously interpreted or applied the law and issued an order unsupported by substantial evidence. RCW 34.05.570(3)(d), (e). We address the latter assignment of error first.

The underlying and focal question raised by this appeal is whether the ESD commissioner committed error when ruling that Jeffrey Metzener did not commit misconduct when drinking alcohol at lunch on September 22, 2016. We deem two of the commissioner's findings of fact critical to that conclusion: (1) Metzener lacked reason to know he would be subject to an off-duty alcohol test on September 22, and (2) on September 22, Metzener did not anticipate returning to work in the near future. The findings relate to one another. Medelez challenges these findings of fact. We must determine if sufficient evidence supports the findings.

This court reviews agency findings of fact to determine whether substantial evidence supports the findings. *Morgan v. Department of Social & Health Services*, 99 Wn. App. 148, 151, 992 P.2d 1023 (2000). We defer to factual decisions with the evidence viewed in the light most favorable to the party who prevailed in the highest

17

forum that exercised fact-finding authority, here the department commissioner. *DeFelice v. Employment Security Department*, 187 Wn. App. at 787 (2015); *William Dickson Co. v. Puget Sound Air Pollution Control Agency*, 81 Wn. App. 403, 411, 914 P.2d 750 (1996). Jeffrey Metzener prevailed in this forum.

Substantial evidence is evidence that would persuade a fair-minded person of the truth or correctness of the matter in light of the whole record. *DeFelice v. Employment Security Department*, 187 Wn. App. at 787. The substantial evidence standard is highly deferential. *ARCO Products Co. v. Washington Utilities and Transportation Commission*, 125 Wn.2d 805, 812, 888 P.2d 728 (1995). Evidence may be substantial even if conflicting or susceptible to other reasonable interpretations. *Fred Hutchinson Cancer Research Center v. Holman*, 107 Wn.2d 693, 713-14, 732 P.2d 974 (1987). The reviewing court may not reweigh evidence or re-determine credibility. *William Dickson Co. v. Puget Sound Air Pollution Control Agency*, 81 Wn. App. at 411 (1996).

We deem the ESD commissioner's decision as prima facie correct, and the party challenging the commissioner's decision bears the onus of showing the decision to be error. RCW 34.05.570(1)(a); *Michaelson v. Employment Security Department*, 187 Wn. App. 293, 298, 349 P.3d 896 (2015). The commissioner may make her own independent determination based on the record and has the right to modify or replace an ALJ's findings, including findings of witness credibility. *Smith v. Employment Security Department*, 155 Wn. App. 24, 35 n.2, 226 P.3d 263 (2010).

After reviewing the entire record, we conclude that substantial evidence supports the ESD commissioner's finding that Jeffrey Metzener lacked reason to know he would be subject to an off-duty alcohol test on September 22. We also hold that substantial evidence supports the finding that, on September 22, Metzener did not anticipate returning to work in the near future. Metzener's testimony overwhelmingly supports both conclusions. None of the documents introduced as exhibits contradict the findings. Metzener reasonably concluded, because of the taking of his truck keys, that he would not return until around October 11, after his recovery from back surgery. Although Metzener knew that he needed to submit to a return to work drug screening, no one told him he would be subject to the screen before his return to work and no one told him the screen would include a breathalyzer.

We now address a chain of factual contentions asserted by employer Medelez. Medelez contends that Jeffrey Metzener knew of a prohibition against alcohol because his substance abuse plan required him to refrain from using any "mind/mood altering substances" and, according to Medelez, alcohol is a mind-altering substance. Medelez, however, misquotes that portion of the substance abuse plan read into the record during the ALJ evidentiary hearing. The plan referenced "mind/mood altering *chemicals*" and "mind/mood altering *medication*," not substances. CP at 57 (emphasis added). The plan did not identify what constitutes a mind/mood altering chemical or medication.

We decline to compare the evil of controlled substances with the malevolence of alcohol or ethanol. Since the end of prohibition, society has accepted drinking of alcohol. Alcohol lacks the stigma attached to drugs and holds a positive association with family gatherings, food, and celebrations. According to a 2016 survey conducted by the Substance Abuse and Mental Health Services Administration of the United States Department of Health and Human Services, 50.7 percent of American adults regularly imbibe alcohol. 64.8 percent of those surveyed had drank alcohol in the last year. Alcohol is legal in most of the world.

Medelez presented to the ESD no testimony that one reading the language of Jeffrey Metzener's substance abuse plan would deem alcohol a prohibited substance. Metzener testified that he did not consider off-duty consumption of alcohol precluded by the plan. Metzener further testified that he never anticipated being called to alcohol testing while being off duty, and Medelez presented no testimony refuting Metzener's assertion.

The Medelez employment policy referenced random testing for controlled substances, not for alcohol. The ESD commissioner could reasonably conclude that Metzener did not expect to be tested for alcohol while off duty. A contrary conclusion by this court would entail reweighing mostly undisputed evidence.

Medelez also challenges the commissioner's finding by arguing that Jeffery Metzener possessed a duty to comply with federal CDL regulations. Medelez further

20

contends that Metzener violated the regulations. Medelez cites 49 C.F.R. § 40.305(a), which declares that, when an employer wants to permit an employee with a substance abuse plan to return to the performance of safety-sensitive functions, the employee must undergo a "return-to-duty test." The regulation further states:

> The employee must have a negative drug test result *and/or* an alcohol test with an alcohol concentration of less than 0.02 before resuming performance of safety-sensitive duties.

(Emphasis added.) Nevertheless, the regulation refers to a return to duty test, and neither Medelez nor Jeffrey Metzener intended Metzener to return to work on September 22. Although Metzener knew he would need to complete a return to duty screen, Medelez never informed him the screen would occur before his return to work.

The return-to-duty regulation, 49 C.F.R. § 40.305(a), references a drug test "and/or" alcohol test without any further explanation. The language creates the question of whether the regulation requires both tests for all drivers with a substance abuse plan or whether the rule requires only one test if the substance abuse plan addressed only alcohol or only controlled substances. Another regulation helps to answer this question. 49 C.F.R. § 40.307(c) reads:

> You are [the substance abuse professional] the sole determiner of the number and frequency of follow-up tests and whether these tests will be for drugs, alcohol, or both, unless otherwise directed by the appropriate DOT agency regulation. For example, if the employee had a positive drug test, but your evaluation or the treatment program professionals determined that the employee had an alcohol problem as well, you should require that the employee have follow-up tests for both drugs and alcohol.

21

Jeffrey Metzener entered a substance abuse plan because of use of marijuana, not because of alcohol. William Ellis never concluded that Metzener encountered an alcohol problem. Therefore, Metzener could reasonably conclude that he would be subject only to testing for marijuana or other controlled substances.

Medelez underscores that the decision as to the specific date on which to perform a test is the employer's decision under 49 C.F.R. § 40.307(d)(3). We read the regulation to afford the substance abuse professional, not the employer, this prerogative, but regardless this second regulation refers to follow-up testing for the substance previously abused by the driver, not a return-to-duty test for controlled substances and alcohol.

To repeat from the facts, Jeffrey Metzener's substance abuse plan states:

> If Mr. Metzener is laid off from performing safety sensitive duties, he will not have to perform follow-up *urine screens*. When he returns to safety sensitive duties the return to duty *drug testing* will resume from where it left off. . . . Once Mr. Metzener is notified to submit to a DOT follow-up *drug screen*, he will have three (3) hours to complete the process.

CP at 105 (emphasis added). Thus, the plan told Metzener his return to duty and follow-up screening will entail drug testing, not alcohol testing. Based on the unrefuted documentation and testimony, the ESD commissioner correctly found that neither the substance abuse plan nor testimony warned Metzener of any prohibition of off-duty consumption of alcohol.

22

To support its assertion that Metzener possessed notice that he could be tested for alcohol on any day, Medelez highlights a provision in the substance abuse plan that "follow-up tests are to be unpredictable and unannounced." CP at 105, 126 (boldface and underlining omitted). The provision does not declare, however, that a follow-up test could happen on an employee's day off, let alone that the employee would be tested for alcohol on a day off duties. Jeffrey Metzener could reasonably assume that any testing for alcohol on his bloodstream would occur on a workday, since any intoxication would affect the employer's interest only on workdays.

William Ellis and, in turn, Medelez, directed Jeffrey Metzener to undergo a return to duty screening on September 22. While William Ellis' substance abuse plan specifies unpredictable and unannounced follow-up testing, the plan does not warn of random return to duty tests. Nothing in the record suggests the potential administration of unpredictable or unannounced screening on days off from work.

While the driver must submit to unannounced follow-up testing, the employer lacks a legitimate interest in testing an employee at a time when the employee is not scheduled to work. Such testing constitutes an intrusion into the employee's life and does not relate to the employer's interest in having employees who are sober while driving. While return to duty tests occur before the employee returns to work, no discernable reason exists for such testing to be unannounced and performed weeks before the return to work.

23

Medelez argues that the commissioner erred when she concluded that Jeffrey Metzener did not expect to return to work until October 11. Nevertheless, Metzener testified to this belief and Medelez presented no evidence impeaching his testimony. In a questionnaire submitted to the ESD, Metzener wrote: "[l]aid off due to back injury 9-20-16—Terminated due to positive Breath (Return to duty) alcohol test 9-22-16." CP at 97. This response corroborates Metzener's testimony before the ALJ that he believed Medelez took his truck keys on September 21 because he informed his employer of the back injury and surgery and he understood he would not return to work for three weeks, at which time he would undergo a return to duty test.

Medelez highlights that Dawn Fischer informed Jeffrey Metzener, on September 21, that he had not completed the return to duty test and would need to undergo the test before returning to work. The ESD commissioner entered a finding consistent with this evidence. Nevertheless, the finding does not equate to Metzener's knowing or expecting a return to duty test on September 22. He would not return to duty until October 11.

Medelez also underlines that Jeffrey Metzener testified that he believed he earlier performed the return to duty test, which necessarily would leave him subject to only random tests. Medelez observes that random tests serve the function of keeping the employee guessing as to when he would need to be free of prohibited substances. Medelez's contention, however, ignores that Metzener's substance abuse plan only concerned his prior marijuana use, not alcohol use, and that the employee could

24

reasonably assume that even random testing, particularly for alcohol, would occur only on workdays.

Medelez notes that it or William Ellis needed to notify the Department of Transportation of Jeffrey Metzener's test results, who would suspend Metzener's CDL. Because the agency would suspend the license, Metzener could no longer work. We do not know for sure whether the agency automatically suspends the license of a truck driver for a breathalyzer taken while not driving. Also, Medelez terminated Metzener's employment, rather than suspend his employment until Metzener could reinstate the license.

*Issue 4: Whether the ESD commissioner committed any legal error?*

*Answer 4: No.*

We now ask whether the findings of fact upheld by this appeals court support the conclusion that Jeffrey Metzener did not commit misconduct that disqualified him from unemployment benefits. We also ask whether the commissioner correctly interpreted the law. Although we review questions of law de novo, this court gives substantial weight to the agency's interpretation of the statutes it administers. *Smith v. Employment Security Department*, 155 Wn. App. at 32 (2010). Accordingly, we afford the commissioner's interpretation of "misconduct," as defined under the employment security act, substantial weight because of the agency's expertise in the field of employment law. *Markam Group*

*Inc., P.S. v. Department of Employment Security*, 148 Wn. App. 555, 561, 200 P.3d 748 (2009).

The question of whether the facts surrounding a claimant's discharge constitute misconduct is a different inquiry from whether an employer may terminate an employee. *Tapper v. Employment Security Department*, 122 Wn.2d at 412 (1993). An employee's conduct may justify termination and yet warrant unemployment benefits. *Wilson v. Employment Security Department*, 87 Wn. App. 197, 203-04, 940 P.2d 269 (1997). Assuming the employment contract between Medelez and Jeffrey Metzener allowed Medelez to fire Metzener only for good cause or just cause, cause may have existed. But good cause is not the question on appeal.

RCW 50.20.066 reads:

> (1) An individual shall be disqualified from benefits beginning with the first day of the calendar week in which he or she has been discharged or suspended for *misconduct* connected with his or her work.

(Emphasis added.) In turn, RCW 50.04.294(1) and (2) defines "misconduct" as:

> (1) "Misconduct" includes, but is not limited to, the following conduct by a claimant:
> (a) Willful or wanton disregard of the rights, title, and interests of the employer or a fellow employee;
> (b) Deliberate violations or disregard of standards of behavior which the employer has the right to expect of an employee;
> (c) Carelessness or negligence that causes or would likely cause serious bodily harm to the employer or a fellow employee; or
> (d) Carelessness or negligence of such degree or recurrence to show an intentional or substantial disregard of the employer's interest.

(2) The following acts are considered misconduct because the acts signify a willful or wanton disregard of the rights, title, and interests of the employer or a fellow employee. These acts include, but are not limited to:

(a) Insubordination showing a deliberate, willful, or purposeful refusal to follow the reasonable directions or instructions of the employer;

(b) Repeated inexcusable tardiness following warnings by the employer;

(c) Dishonesty related to employment, including but not limited to deliberate falsification of company records, theft, deliberate deception, or lying;

(d) Repeated and inexcusable absences, including absences for which the employee was able to give advance notice and failed to do so;

(e) Deliberate acts that are illegal, provoke violence or violation of laws, or violate the collective bargaining agreement. However, an employee who engages in lawful union activity may not be disqualified due to misconduct;

(f) Violation of a company rule if the rule is reasonable and if the claimant knew or should have known of the existence of the rule; or

(g) Violations of law by the claimant while acting within the scope of employment that substantially affect the claimant's job performance or that substantially harm the employer's ability to do business.

Medelez relies on subparagraphs (a) and (d) of RCW 50.04.294(1). The employer bears the burden of establishing misconduct. *Nelson v. Department of Employment Security*, 98 Wn.2d 370, 374-75, 655 P.2d 242 (1982).

RCW 50.04.294(1)(a) characterizes "misconduct" as including a willful or wanton disregard of the interest of an employer. This disqualifying provision requires a showing of the employee's intent to harm the employer. *Kirby v. Department of Employment Security*, 179 Wn. App. 834, 847, 320 P.3d 123 (2014). The ESD commissioner was correct to omit any conclusion that Jeffrey Metzener intended to harm Medelez.

27

RCW 50.04.294(1)(d) addresses carelessness or negligence of such degree or recurrence to show an intentional or substantial disregard of the employer's interest. The inclusion of the words "negligence" and "intentional" in the same provision appears contradictory, but suggests excessive negligence or frequent negligence. Courts have found carelessness or negligence that rises above "ordinary negligence" when the employee's actions create a risk of impacting the employer's interests in serving its customers and of exposing the employer to liability. *Cuesta v. Department of Employment Security*, 200 Wn. App. 560, 574-75, 402 P.3d 898 (2017); *Smith v. Employment Security Department*, 155 Wn. App. at 36 (2010).

In *Cuesta v. Department of Employment Security*, the court held that an airplane inspector committed negligent misconduct when he signed a document affirming the safety of parts that he did not inspect. The inspector's negligence showed a substantial disregard for the employer's interests in keeping passengers safe because he knew the gravity of his job, knew others relied on his signature as an attestation to safety of the flying public, and knew he must never approve parts without performing the inspection.

In *Smith v. Employment Security Department*, the court held that a public employee's recording of conversations with co-workers and members of the public without their consent constituted carelessness or negligence of such degree as to show intentional or substantial disregard of the county employer's interest. Public knowledge of Smith's recordings could have adversely impacted the county's serving of its

28

constituents by making citizens less willing to speak with county employees. The recordings could have also exposed the county to litigation and liability.

Medelez, as Jeffrey Metzener's employer, held a legitimate interest in its drivers' safely performing work duties and maintaining an image of its employees complying with controlled substance laws. Nevertheless, we agree with the ESD commissioner that Jeffrey Metzener's off-duty conduct did not adversely impact his employer's interest in safety, increase liability risk, or harm Medelez's public image. Metzener was not scheduled to drive for the employer in the near future. No evidence showed that Metzener drove a private vehicle under the influence such as to jeopardize his commercial driver's license. Metzener engaged in no illegal activity.

Medelez argues that Jeffrey Metzener acted carelessly or negligently when he drank alcohol knowing he could be subject to an alcohol test at any time. Nevertheless, we have already agreed that the ESD commissioner could reasonably conclude that Metzener legitimately believed he would not be subject to an alcohol breathalyzer on September 22.

Finally, Medelez observes that both it and Jeffrey Metzener believed until September 21 that Metzener had taken a return to duty test and therefore possessed a valid CDL. According to Medelez, when the two discovered otherwise on September 21, Medelez retained the keys to the truck driven by Metzener. Medelez may imply that Medelez then fired Metzener because of the lack of a CDL. The undisputed evidence

29

shows otherwise. Medelez never informed Metzener that it had terminated his employment until after the September 22 testing.

Medelez suggests that, if we grant Jeffrey Metzener unemployment compensation, we reward him for violating the law and endangering the safety of the traveling public when operating a truck on the roads of Washington State without a lawful CDL. Nevertheless, even assuming Metzener lacked a current license, Medelez's condemnation of Metzener also indicts Medelez. Assuming the State had revoked Metzener's CDL in November 2015 and further assuming that the February 2016 screen did not qualify to reinstate the license, Medelez knew or should have known, at the time of hiring Metzener, that Metzener lacked a current CDL, since Medelez possessed a copy of William Ellis' substance abuse plan. If Metzener should have known, on the basis of the plan, that he lacked a valid commercial driver's license until he performed a return to work evaluation, Medelez should have also known this fact. Medelez, as the employer, should have known the trucking regulations better than Metzener. Medelez should have confirmed whether Metzener held a valid license. If Metzener's driving endangered the safety of the Washington public, Medelez endangered the public safety by employing him.

## CONCLUSION

We uphold the ESD commissioner's ruling granting Jeffrey Metzener an award of unemployment benefits and thereby reverse the superior court.

No. 36225-6-III (Cons. w/ 36335-0-III)
Medelez, Inc. v. Dept. of Employment Security

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, J.

_____
Lawrence-Berrey, C.J.