COURT OF APPEALS DIV 1
2014 MAR 10 AM 9: 39


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

JEFF KIRBY, an individual, and )
PUGET SOUND SECURITY PATROL, ) No. 69807-9-I
INC., )
                              ) DIVISION ONE
                     Appellant, )
                              ) PUBLISHED OPINION
          v. )
                              )
STATE OF WASHINGTON )
DEPARTMENT OF EMPLOYMENT )
SECURITY, )
                              ) FILED: March 10, 2014
             Respondent. )

GROSSE, J. — When the record supports a finding that an employee was fired for failing to follow the employer's directions but the employer fails to show that the directions were reasonable and that the failure to follow them was deliberate, willful, or purposeful, the employee's conduct does not rise to the level of misconduct disqualifying the employee from receiving unemployment benefits. Here, the commissioner found that the employee acted out of apprehension and confusion, rather than out of a conscious intent to harm the employer when she refused to follow her employer's instructions. Further, the commissioner found that the employer's instructions were not reasonable. Because substantial evidence supports these findings, the trial court properly upheld the commissioner's decision that the employee did not commit misconduct disqualifying her from receiving benefits. Accordingly, we affirm.

FACTS

Dorothy Thomas worked as a security officer for Puget Sound Security, Inc., (PSS) from December 23, 2009 through June 15, 2011. Her position was full time, permanent, and non-union, and she earned $10.50 per hour. United Parcel Service (UPS) was one of PSS's clients and Thomas was assigned to security detail at a UPS warehouse in Auburn, Washington. At this warehouse, imported products were delivered, unpacked, and repackaged for delivery to local retail stores.

As part of her job, Thomas was required to keep daily logs of her observations and to complete incident reports for any observed safety hazards, criminal activities, or unprofessional conduct by UPS employees. Her immediate supervisor from PSS was Dan Dose, who was on site at the UPS warehouse and to whom she turned in her logs and reports. The logs became the property of UPS and were kept in Dose's office on site at UPS.

Thomas also reported to UPS employee Doug Langston, who was the site supervisor at the Auburn warehouse. Additionally, Thomas often spoke with UPS Human Resources (HR) staff; sometimes Langston asked her to contact HR and other times HR contacted her. According to PSS, both Langston and Dose handled issues documented in incident reports. Matters that could not be resolved at that level were to be sent to Dose's immediate supervisor, PSS Operations Manager Steven Squire. Dose was to send such incident reports to Squire at the PSS office in Bellevue, Washington.

While at the UPS warehouse site, Thomas overheard a UPS employee

bragging about possibly stealing some headphones. Thomas wrote up an incident report, which was submitted to Dose and sent to the UPS HR office. The same UPS employee also told Thomas that he could get her fired, that he was a gang member, and that he raised Pit Bulls for gambling. She included this information in an incident report and talked to the employee's manager about it, but was told that the employee was just "bull shitting" and it was nothing. Theft of the headphones, however, began to occur and the insurance representative from the headphone company became involved and asked the UPS employees to empty their pockets. Thomas observed that some of the employees were carrying pocket knives in violation of UPS policy. She raised this with Langston and the employees were told not to carry the knives.

Theft of the headphones continued and the insurance company then authorized UPS to use scanners on the employees. But while there were scanners on the premises, Langston would not authorize Thomas to use the scanners on the employees. Dose told Thomas not to write up the employee she overheard talking about the possible thefts unless she actually caught him stealing.

Frustrated that nothing was being done to stop the thefts, Thomas then decided to call the UPS 800 number that was posted at the site for UPS employees to report security and other issues. She told a UPS security investigator about the theft and the scanners that were not being used and other problems she had encountered. She also told the UPS investigator that she did not want to be fired for reporting the employee and he told her she would not be

3

fired.  Shortly after she made the call, the scanners were put to use and the thefts ceased.

Thomas also reported other incidents to Langston and Dose, such as when an employee brought a weapon to work.  Additionally, in early June 2011, Thomas reported to Langston and Dose that some employees told her about drug activity involving other employees that was occurring in the parking lot.  She also reported that she smelled marijuana on some employees when they went through the scanner.  Langston had UPS HR call Thomas about this and she told HR what she knew and suggested that the police be called to bring a drug sniffing dog to the work site.  Dose told her she should not get involved because it would be her word against the employees'.

On June 8, 2011, Langston called Squire (Dose's supervisor) and complained that Thomas had called the employee 800 number and reported to UPS corporate headquarters about an alleged theft ring and management cover up at the Auburn warehouse.  Langston was upset because the employee 800 number was not part of the chain of command under UPS's contract with PSS and Thomas's actions were outside of that contract.  He asked that Thomas not continue to work at the UPS warehouse.

This was the first Squire had heard of the alleged theft ring.  Apparently, Dose had not forwarded to Squire Thomas's incident reports about it.  Squire then reported the call to PSS Chief Executive Officer (CEO) George Schaeffer and Schaeffer contacted Langston.  Langston recounted to Schaeffer several reports Thomas made to him and HR alleging harassment, concealed weapons,

and gambling that UPS had determined unfounded. Langston said that "the final straw" was when a corporate security investigator came out from Arizona after Thomas called the employee 800 number about the alleged theft ring.

Schaeffer assured UPS management that Thomas would be removed from the warehouse site as requested. He also told Langston that PSS would get an incident report about her allegations and do a complete investigation into them. That way, PSS could provide UPS with specifics so UPS could further investigate the allegations.

Squire then called Thomas at home that evening and told her he was removing her from the UPS warehouse site because of the call from Langston. When Thomas began to tell him what had been happening at the warehouse, Squire told her to write an incident report about it and come in on June 10, 2011 to discuss it with him and William Cottringer, the Executive Vice President for Employee Relations. Squire did not talk to Dose or ask him for any of the logs or reports Thomas had written and submitted to Dose.

On June 10, Thomas arrived about 45 minutes late to the meeting. Squire was not in the office at the time because he had been called out to an emergency. The HR assistant at the office called Squire and he told her to ask Thomas to fill out an incident report explaining her actions and that he would be back in a few minutes. When the HR assistant asked Thomas to write the incident report, Thomas became suspicious because she had already written logs and reports about the incidents and did not know that PSS thought she had not written one at all. Thomas was also expecting that she would be meeting first

with Squire about the report but never had the opportunity to do so before being asked to write it. Thomas told the HR assistant that she did not want to write the report because she was afraid that it would be used against her and also said she felt that she might need a lawyer.

The HR assistant reported to the CEO that Thomas would not write the report. Schaeffer then came out and introduced himself to Thomas. He told her that the report was required to show shift times and details and that PSS had to provide this information to Langston. He said that he was not asking her to incriminate herself. Thomas still refused to write a report. Schaeffer asked her again to write down what she had already told UPS HR and the investigator at the employee 800 number but she still refused. Schaeffer then said they were at an impasse and told Thomas he would pay for the hour she had spent that morning and the next step was a follow-up disciplinary hearing. He said that Cottringer would contact her on June 13, 2011 to schedule that meeting and until then she was removed from the schedule.

Cottringer did not call her on June 13 because he was on vacation until the next day. On June 14, Thomas called the HR assistant and asked if she would be assigned work on June 15. The HR assistant told her she was suspended until after the meeting with Cottringer, which was scheduled for the next day, June 15.

On June 15, 2011, Thomas met with Cottringer and the HR assistant. They told her she was being discharged for insubordination for refusing to comply with directions given to her by the HR assistant and the CEO to write an

incident report. Thomas asked if she could fill out one then if it would keep her from being fired, but they told her it was too late as she had already refused twice.

Following her discharge, Thomas applied to the Washington State Employment Security Department (the Department) for unemployment benefits. On July 9, 2011, the Department issued a determination notice denying her request for benefits because she was fired for work misconduct and therefore did not qualify for benefits. The Department concluded that her refusal to write a required incident report was an act of misconduct because she failed to comply with a reasonable rule or direction of her employer.

Thomas appealed this determination. On September 30, 2011, after a hearing, the administrative law judge (ALJ) set aside the Department's determination. The ALJ's decision concluded that Thomas was not discharged due to willful or wanton disregard of the employer's interests and was therefore not disqualified for unemployment benefits.

On October 13, 2011, PSS petitioned the commissioner of the Department for review of the ALJ's decision. The commissioner concluded that the record was insufficient to permit a decision on the issue of whether the ALJ properly applied the law in concluding that Thomas was not discharged for misconduct. The commissioner ordered a remand for a hearing and a decision de novo which was to address:

> (1) the circumstances leading to and subject matter of the employer's request for an incident report from claimant; (2) claimant's motivation, if any, for wanting to talk with "someone" (presumably Mr. Squires) before preparing an incident report,

and about what; and (3) whether the employer's directive to claimant to comply with applicable policy was reasonable in light of the above.

On February 2, 2012, the matter came on for a hearing on these issues before an ALJ. On February 13, 2012, the ALJ issued an order setting aside the Department's determination. The ALJ's decision concluded that Thomas did not commit misconduct, but an error of judgment, and therefore was not disqualified to receive benefits.

PSS filed a petition to the commissioner for review of the ALJ's decision. On April 6, 2012, the commissioner issued an order affirming the ALJ's decision, agreeing that Thomas's conduct amounted to a good faith error in judgment and did not rise to the level of disqualifying conduct. PSS appealed the commissioner's order to the superior court and the superior court affirmed. PSS now appeals from the superior court's order.

## ANALYSIS

On an appeal of a final decision by the Employment Security Department commissioner, we review the decision of the commissioner, rather than the underlying decision of the ALJ, except to the extent that the commissioner adopts the ALJ's findings of fact.[1] We consider a commissioner's decision to be prima facie correct and the burden of demonstrating the invalidity of the agency action is on the party asserting the invalidity, here PSS.[2] We may reverse the

---

[1] Verizon NW, Inc. v. Wash. Emp't Sec. Dep't, 164 Wn.2d 909, 915, 194 P.3d 255 (2008); Griffith v. State Dep't of Emp't Sec., 163 Wn. App. 1, 6, 259 P.3d 1111 (2011).

[2] RCW 34.05.570(1)(a); Smith v. Emp't Sec. Dep't, 155 Wn. App. 24, 32, 226 P.3d 263 (2010).

commissioner's decision if it is based on an error of law, substantial evidence does not support the decision, or it was arbitrary or capricious.[3] We review questions of law de novo and give substantial weight to the agency's interpretation of the statutes it administers.[4] We review findings of fact for substantial evidence in light of the whole record.[5]

RCW 50.20.066(1) provides: "An individual shall be disqualified from benefits . . . [if] he or she has been discharged or suspected for misconduct connected with his or her work . . . ." RCW 50.04.294(1) defines "misconduct" as follows:

> "Misconduct" includes, but is not limited to, the following conduct by a claimant:
> (a) Willful or wanton disregard of the rights, title, and interests of the employer or a fellow employee;
> (b) Deliberate violations or disregard of standards of behavior which the employer has the right to expect of an employee;
> (c) Carelessness or negligence that causes or would likely cause serious bodily harm to the employer or a fellow employee; or
> (d) Carelessness or negligence of such degree or recurrence to show an intentional or substantial disregard of the employer's interest.

Our appellate courts have held that an employee acts with willful disregard of an employer's interest when the employee "(1) is aware of his employer's interest; (2) knows or should have known that certain conduct jeopardizes that interest; but (3) nonetheless intentionally performs the act, willfully disregarding its

---

[3] RCW 34.05.570(3)(d),(e),(i).
[4] Everett Concrete Prods, Inc. v. Dep't of Labor & Indus., 109 Wn.2d 819, 823, 748 P.2d 1112 (1988).
[5] RCW 34.05.570(3)(e); Smith, 155 Wn. App. at 32.

consequences."[6]

RCW 50.04.294(2) provides that the following acts are considered misconduct because they "signify a willful or wanton disregard of the rights, title, and interests of the employer or a fellow employee:"

(a) Insubordination showing a deliberate, willful, or purposeful refusal to follow the reasonable directions or instructions of the employer;

(b) Repeated inexcusable tardiness following warnings by the employer;

(c) Dishonesty related to employment, including but not limited to deliberate falsification of company records, theft, deliberate deception, or lying;

(d) Repeated and inexcusable absences, including absences for which the employee was able to give advance notice and failed to do so;

(e) Deliberate acts that are illegal, provoke violence or violation of laws, or violate the collective bargaining agreement. However, an employee who engages in lawful union activity may not be disqualified due to misconduct;

(f) Violation of a company rule if the rule is reasonable and if the claimant knew or should have known of the existence of the rule; or

(g) Violations of law by the claimant while acting within the scope of employment that substantially affect the claimant's job performance or that substantially harm the employer's ability to do business.

RCW 50.04.294(3) excludes the following from the definition of "misconduct:"

(a) Inefficiency, unsatisfactory conduct, or failure to perform well as the result of inability or incapacity;

(b) Inadvertence or ordinary negligence in isolated instances; or

(c) Good faith errors in judgment or discretion.

"[W]hether a particular employee's behavior constitutes 'misconduct connected with his or her work' is a mixed question of law and fact, in that it requires the

---

[6] Hamel v. Emp't Sec. Dep't of State of Wash., 93 Wn. App. 140, 146-47, 966 P.2d 1282 (1998), review denied, 137 Wn.2d 1036, 980 P.2d 1283 (1999).

application of legal precepts (the definition of 'misconduct connected with his or her work') to factual circumstances (the details of the employee's discharge)."[7] Characterizing "misconduct" as a mixed question of law and fact does not mean that a reviewing court is free to substitute its judgment for that of the agency as to the facts; instead, the factual findings of the agency are entitled to the same level of deference which would be accorded under any other circumstance.[8]

Here, the commissioner's order adopted the ALJ's findings of fact and conclusions of law, concluding that resolution of the matter turned on the credibility findings made by the ALJ. The ALJ found Thomas's testimony credible and concluded that Thomas "acted out of apprehension and confusion, rather than out of a conscious intent to harm the employer," and that her "failure to give more of an explanation or to attempt to write something down on June 10, 2011, was at worst the kind of error of judgment that the statute states is not misconduct." As the ALJ explained:

> While it is undisputed that the claimant did not write an incident report when asked to do so by the HR [a]ssistant and the CEO on June 10, 2011, those requests did not occur in a vacuum. The facts set forth above show that the circumstances leading to and subject matter of the employer's request for an incident report were complex, and that the parties did not have the same understanding of what the claimant was being asked to do. The employer was understandably upset that their client, UPS, was angry about how the claimant's concerns had been handled and understandably eager to obtain the information that would allow them to figure out the details and provide a response that would satisfy their client. When CEO Schaeffer ordered the claimant to write an incident report, he believed that he was asking for the first written documentation of her allegations and concerns. He did not know that she had previously logged and written incident reports as

---

[7] Tapper v. State Emp't Sec. Dep't, 122 Wn.2d 397, 402, 858 P.2d 494 (1993).
[8] Tapper, 122 Wn.2d at 403.

events had unfolded. These contemporaneous documents would have provided much more accurate information on shifts, times, and details on what was happening and where it was than a report written in the office from memory about numerous events months after the fact. From the CEO's perspective, his order was reasonable, and the claimant appeared to be insubordinate. The claimant, on the other hand, knew that she had already provided contemporaneous written documentation, but she did not know that CEO Schaeffer did not know of her earlier logs and reports or that he believed that she was refusing to fill out a report at all. This information gap was not the claimant's fault. Rather, her immediate supervisor did not convey what she had written in her logs and incident reports to his supervisor, Mr. Squire. The break in communication occurred above the claimant in the chain of command.

These conclusions are supported by the ALJ's findings of fact and PSS does not appear to challenge the factual basis for the ruling.[9] Rather, PSS contends that as a matter of law, Thomas's actions in refusing to write the report constituted misconduct under the statute because they amounted to insubordination and willful and wanton disregard for the employer's interests. PSS contends that regardless of what her motivations were in refusing to write the report, the refusal itself amounted to an act of insubordination because it was a willful, deliberate, purposeful refusal to follow her employer's instructions.

The ALJ concluded that Thomas's conduct did not amount to willful or wanton disregard of PSS's interests because Thomas acted out of confusion and apprehension, rather than an intent to harm the employer.[10] PSS fails to show that this conclusion is clearly erroneous. Because she had already documented

---

[9] See Brief of Appellant at 3 (assigning error only to findings of fact and conclusions of law that Thomas committed no misconduct as defined by statute and that statutory exception of good faith error in judgment applies; no assignments of error to specific factual findings).

[10] This conclusion is supported by the AJL's factual findings, which found Thomas's testimony credible and have not been challenged on appeal.

the incident and submitted the logs and reports to her immediate supervisor when it occurred and the thefts had been resolved, Thomas's refusal to write another one on the spot cannot be viewed as an intent to disregard her employer's interest in having the report written. While PSS is correct that subjective motivations and intent to harm the employer are irrelevant, a showing of misconduct must be established by evidence that the employee was aware that he or she was disregarding the employer's rights.

As the ALJ concluded, Thomas was legitimately confused by the break in communication that was attributable to PSS. The ALJ acknowledged that it was undisputed that Thomas did not write an incident report when asked to do so by the HR assistant and by the CEO, but concluded that PSS did not meet its burden of proof in establishing that she committed misconduct because "the parties did not have the same understanding of what the claimant was being asked to do." The ALJ noted that while the CEO believed he was asking for the first written documentation of her allegations, Thomas did not know that the CEO was unaware of her earlier written documentation or that he believed she was refusing to fill out a report at all. Thus, the facts do not establish that she was aware that she was disregarding the rights and interests of her employer; therefore, she did not intentionally jeopardize those interests by refusing to write the report.

Even if PSS could show that Thomas's refusal to write the report was an intentional and willful refusal to follow the CEO's order, PSS still fails to establish that the order to write the incident report on June 10, 2011 was reasonable,

which is required to establish insubordination. The ALJ concluded that the employer's request that Thomas write the report on June 10, 2011 was not reasonable under the circumstances:

> The events of June 10, 2011, took place in the matter of a few minutes. The claimant had expected that she was coming in to meet with Mr. Squire and would have a chance to explain everything to him. He had asked her to write down information on numerous topics and she wanted guidance from him. As her supervisor, Dan Dose's immediate supervisor, he was familiar with her work site, and because Mr. Dose was responsible to report to Mr. Squire, she thought Mr. Dose had done so. Instead of the meeting with Mr. Squire, the claimant encountered an order from the CEO, whom she had not met before, to write an incident report on the spot. She was confused and afraid and did not do it. At the disciplinary meeting on June 15, 2011, the claimant offered to write a report, but the employer rejected her offer and discharged her. Because the employer thought the claimant's previous communications had only been spoken but not written down before June 10, 2011, their request was reasonable from their perspective, and in the abstract, her refusal would appear to be insubordination. However, the request did not appear reasonable or possible to the claimant on June 10, 2011. In the overall context, her refusal on June 10, 2011, does not exhibit the kind of willful or wanton disregard of the employer's interests that constitute misconduct under the statute. . . .

This conclusion is supported by the ALJ's factual findings, which are unchallenged on appeal, and PSS fails to show the ALJ's ruling is clearly erroneous. Viewed in context, the CEO's request for Thomas to immediately write an incident report on the spot was not reasonable. She had already submitted reports on the incident that were prepared at the time it occurred, which were more accurate and should have been forwarded to her supervisors. But she was now being required to write another report without any context or guidance about what the report should contain, and without benefit of first reviewing reports she already made at the time of the incident to ensure she was

14

giving accurate information and sufficient detail. She was also required to do so after first being told that she would be meeting with a supervisor about the report and then told she could not meet with that supervisor before writing the report.

The cases cited by PSS where the court held that an employee's refusal to follow an employer's directions was misconduct do not require a different result. In Harvey v. Department of Employment Security, the employee refused to obey her employer's order to fold linens because she felt there were other tasks that took precedence and was simply delaying her response to the order.[11] The court concluded that the request to fold the linens was reasonable and rejected the employee's claim that she did not intend to refuse the order, noting that there was no evidence that she had or offered any such explanation for refusing to follow the order.[12] But here, as discussed above, the ALJ concluded that PSS's order to write the report on the spot was not reasonable and found that there was credible evidence that Thomas had an explanation for refusing the order.

PSS also cites Peterson v. Employment Security Department, where the court held that a postal worker committed misconduct when he refused to answer his supervisor's question about where he had been when he left work on an authorized break, but his supervisor thought he left without permission.[13] After the supervisor told him he had to answer her question and not go out on his route, the employee got into his vehicle and told the supervisor that she had no

---

[11] 53 Wn. App. 333, 334-35, 766 P.2d 460 (1988).
[12] Harvey, 53 Wn. App. at 337, 341.
[13] 42 Wn. App. 364, 711 P.2d 1071 (1985).

business trying to talk to him now after he had tried to talk to her for weeks, and then drove away.[14] The court concluded that the employee's remarks to his supervisor indicated that his purpose in refusing to respond to his supervisor was a deliberate act resulting from animosity.[15] But here, the evidence showed that Thomas refused to respond based on her mistaken belief that the CEO knew she had already submitted the requested documentation and she was therefore confused and suspicious of the request; this was not the case in Peterson, where it was clear the employee knew his supervisor did not know where he had been and that she had a legitimate reason for asking. Rather, as the ALJ concluded and the commissioner agreed, Thomas's refusal was more appropriately characterized as a good faith error in judgment.

We affirm.

WE CONCUR:

_____

[14] Peterson, 42 Wn. App. at 365.
[15] Peterson, 42 Wn. App. at 371.

16