## NOTICE:   SLIP OPINION
### (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clientsofwareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| EMMA WHITEHALL,<br><br>    Appellant/ Cross-Respondent,<br><br>    v.<br><br>WASHINGTON STATE<br>EMPLOYMENT SECURITY<br>DEPARTMENT,<br><br>    Respondent/ Cross-Appellant. | No. 83299-9-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

COBURN, J. — A Washington Employment Security Department (Department) commissioner denied Emma Whitehall unemployment benefits. The commissioner determined that she voluntarily quit her position without good cause when she refused to comply with an employment policy knowing it would result in her job separation, and also that she was unavailable to accept work while she was seeking unemployment benefits because she did not have prearranged childcare. Snohomish County Superior Court disagreed that Whitehall voluntarily quit and that she was unavailable to accept work. The court nonetheless upheld the denial of benefits finding that Whitehall was disqualified because she was discharged for misconduct. Whitehall appeals and the Department cross-appeals the court's ruling reversing the commissioner's finding

Citations and pin cites are based on the Westlaw online version of the cited material

that Whitehall voluntarily quit and that she was unavailable to accept work.

Substantial evidence supports the commissioner's ruling that Whitehall

voluntarily quit but did not support the ruling that she was unavailable to accept

work.  Thus, we affirm in part and reverse in part.

FACTS

Emma Whitehall began full-time employment at Sprouts Preschool and

Childcare (Sprouts) in February 2017.  At the time of Whitehall's separation from

Sprouts, she was a "lead infant teacher."  Throughout her employment, she was

assigned to care for infants.

Sprouts only hired nonsmoking teachers and Whitehall did not smoke

when she was hired.  The staff handbook, which all teachers initial, sign, and

date each year, contained a tobacco use policy stating the following:

> Cigarettes and smokeless tobacco products are prohibited on
> Sprouts premises by Staff, Parents, or workers of any kind,
> including parking lots and outdoor play areas. Smoking and the use
> of smokeless tobacco products is also prohibited while on off-site
> Sprouts field trips. Sprouts hires only non-smoking employees due
> to asthma/allergies for staff and children.

According to Jennifer Gifford, owner of Sprouts, this policy was based on

Snohomish County Health District's (SCHD) guidelines.[1]  Gifford testified that

SCHD recommended that she not hire teachers who smoke, vape,[2] or chew

tobacco because of the third-hand risk of exposure from residue on clothes and

---

[1] SCHD guidelines were not admitted at the hearing.

[2] Merriam-Webster defines vape as "to inhale vapor through the mouth from a usually battery-operated electronic device (such as an electronic cigarette) that heats up and vaporizes a liquid or solid."  MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/vape) (last visited January 3, 2023).

2

hair. Gifford explained that she understood the information from SCHD to mean that vaping or e-cigarette liquid "juice" might not specify that it contains tobacco, but it might still contain trace amounts of tobacco.

In July 2019, Gifford learned from Whitehall's social media post that she was smoking e-cigarettes. Whitehall had just started using e-cigarettes the prior week. On July 11, Gifford and the program supervisor had a meeting with Whitehall to inform her that because Sprouts only employs non-smoking teachers, per its tobacco use policy, she would have to quit to remain working there. Whitehall explained that she did not think that e-cigarettes qualified as smoking under the policy, and Gifford informed her that they did. Gifford explained that even though Whitehall was vaping on her lunch breaks or in the morning and not on the premises, there was still a risk of potential harm to the children, which was why Sprouts only hired non-smoking teachers. Gifford informed Whitehall that she would need to stop vaping in order to stay on staff.

Shortly after the meeting, Whitehall text messaged Gifford purporting that she would quit vaping. Whitehall stated that it would take a week for her to quit, and Gifford agreed that she could have a week to do so. In the administrative hearing, Whitehall explained that she initially agreed to quit out of fear of losing her job.

That same night Whitehall called Gifford informing her that she was not going to be able to quit vaping. "It wasn't so much that I couldn't stop, just that I did not think she had the right to expect me to stop. With the policy not mentioning vaping, I did not think I had to stop. Vaping on my breaks, I would

have been fine, but [Gifford] does not have the right to tell me what to do with my personal time." After Whitehall notified Gifford that she changed her mind, Gifford acknowledged that Whitehall was scheduled for work the next day, but Gifford did not have a replacement. The two agreed that Whitehall would not vape before coming into work the next day, July 12, and that Gifford would work on a plan to get staffing covered. Gifford was able to arrange coverage and emailed Whitehall on July 12 informing her that it would be her last day. Whitehall finished her full shift. Though she did not vape that day before work or during lunch, Whitehall testified that she had not quit vaping as of her last day.

The Department denied Whitehall's application for unemployment compensation benefits. Whitehall appealed that decision.

At the administrative hearing, Whitehall testified that "vaping juice, uh, contains tobacco when you have a tobacco-flavored product . . . nicotine salt, which [has] low traces." She thought that the smoke it emits dissipates four times faster than smoking, and although it does not have an odor, it might contain microscopic traces of tobacco, but she was not sure. She stated she was not hiding it from her coworkers because she did not think it would lead to her firing. Sprouts updated their policy for the next school year to be more specific to include e-cigarettes.

The administrative law judge (ALJ) issued an initial order disqualifying Whitehall from receiving unemployment benefits because she had been discharged for misconduct and was not available for work. Whitehall petitioned the commissioner of the Department to review the initial order.

No. 83299-9-I/5

The commissioner adopted all of the ALJ's findings of fact and made augmented findings. The commissioner rejected the ALJ's legal conclusions that Whitehall was discharged for misconduct, and instead concluded that she voluntarily quit without good cause, which disqualified her from receiving benefits under RCW 50.20.050(2)(a) for the period beginning July 7, 2019, and thereafter for seven calendar weeks and until she had obtained bona fide work in covered employment and earned wages in that employment equal to seven times her weekly benefit amount. The commissioner affirmed the ALJ's conclusion on the issue of availability and held that Whitehall was ineligible under RCW 50.20.010(1)(c) for the weeks at issue.

Whitehall appealed the commissioner's decision to Snohomish County Superior Court, which affirmed on different grounds. It reversed as an error of law the commissioner's ruling that Whitehall voluntarily quit her employment. The court concluded that substantial evidence supported that Sprouts discharged Whitehall for misconduct, which disqualified her from receiving unemployment compensation benefits. The court also concluded that substantial evidence did not support the commissioner's finding that Whitehall was unavailable to accept work.

Whitehall appeals the court's order denying unemployment compensation benefits. The Department cross-appeals the court's reversal of the

No. 83299-9-I/6

commissioner's conclusions that Whitehall voluntarily quit and that she was unavailable to accept work.[3]

DISCUSSION

Standard of Review

Washington's Administrative Procedure Act (APA), chapter 34.05 RCW, governs judicial review of employment benefits decisions. Michaelson v. Emp't Sec. Dep't, 187 Wn. App. 293, 298, 349 P.3d 896 (2015). We review only the commissioner's decision, not the administrative law judge's decision or the superior court's ruling. Courtney v. Emp't Sec. Dep't, 171 Wn. App. 655, 660, 287 P.3d 596 (2012) (citing Verizon Nw., Inc. v. Emp't Sec. Dep't, 164 Wn.2d 909, 915, 194 P.3d 255 (2008)).

When reviewing the commissioner's decision, we sit in the same position as the superior court and apply the APA standards directly to the administrative record. Courtney, 171 Wn. App. at 660. This court reviews the commissioner's legal determinations using the APA's "error of law" standard, which allows us to substitute our view of the law for the commissioner's. Id. (citing Verizon, 164 Wn.2d at 915); See RCW 34.05.570(3)(d).

---

[3] On November 3, 2022, Whitehall submitted to the court a scientific study on "nicotine residues in houses of [e-cigarette] users, tobacco smokers, and non-users of nicotine-containing products" under RAP 10.8, which allows for parties to file additional authorities. The "purpose of RAP 10.8 'is to provide parties with an opportunity to bring to the court's attention cases decided after the parties submitted their briefs.'" Ghodsee v. City of Kent, 21 Wn. App. 2d 762 n.16, 782, 508 P.3d 193 (2022) (quoting Gull Indus., Inc. v. Granite State Ins. Co., 18 Wn. App. 2d 842, 857 n.11, 493 P.3d 1183 (2021)). The study is not the type of additional authority contemplated by the rule and we do not consider it.

No. 83299-9-I/7

This court reviews an agency's interpretation or application of the law de novo. Courtney, 171 Wn. App. at 660 (citing Honesty in Env't Analysis & Legis. (HEAL) v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 96 Wn. App. 522, 526, 979 P.2d 864 (1999)). The APA allows reversal of an administrative decision if it is based on an error of law, if it is not based on substantial evidence, or if it is arbitrary or capricious. RCW 34.05.570(3)(d), (e), (i); Michaelson, 187 Wn. App. at 298.

This court considers the commissioner's decision as prima facie correct, and Whitehall bears the burden of establishing its invalidity. Smith v. Emp't Sec. Dep't, 155 Wn. App. 24, 32, 226 P.3d 263 (2010). This court gives substantial weight to the agency's interpretation of the statutes it administers. Kirby v. Emp't Sec. Dep't, 179 Wn. App. 834, 843, 320 P.3d 123 (2014) (citing Everett Concrete Prods. Inc. v. Dep't of Labor & Indus., 109 Wn.2d 819, 823, 748 P.2d 1112 (1988)).

Challenged Findings of Fact

The commissioner's findings of fact are reviewed for substantial evidence in light of the entire record. Kirby, 179 Wn. App. at 843 (citing Smith, 155 Wn. App. at 32). "When a party contends an agency decision is not supported by substantial evidence, we review the entire agency record." Affordable Cabs, Inc. v. Emp't Sec. Dep't, 124 Wn. App. 361, 367, 101 P.3d 440 (2004) (citing RCW 34.05.570(3)(e)). "Substantial evidence is evidence that would persuade a fair-minded person of the truth or correctness of the matter." Smith, 155 Wn. App. at 32. The reviewing court is to view "the evidence and any reasonable inferences

7

in the light most favorable to the party that prevailed" at the administrative proceeding below and may not re-weigh evidence, witness credibility, or demeanor. Affordable Cabs, 124 Wn. App. at 367.

*A.  Harmful*

Whitehall first challenges finding of fact 8[4] where the commissioner found that Gifford told Whitehall she must stop vaping to preserve her job "because tobacco residue on [Whitehall's] clothing and person could be harmful to the children's health." She also challenges the commissioner's augmented finding that "[t]he owner referenced policy, which the owner explained applied to e-cigarettes because the residue/third hand exposure to nicotine could be harmful to the health of the children."

In context, the entire finding related to what Gifford informed Whitehall and was the basis of why she needed to stop vaping. The ALJ found,

> [Gifford] spoke with [Whitehall] on July 11, 2019, about this post and they reviewed Sprouts' tobacco policy. [Gifford] informed [Whitehall] that she must stop vaping to preserve her job because tobacco residue on [Whitehall's] clothing and person could be harmful to the children's health. [Whitehall] agreed to consider her options.

Whitehall does not provide any argument that she was not so informed. Whitehall also does not provide any argument that Gifford did not explain her reasoning as to why the tobacco policy applied to e-cigarettes. Whitehall does not advance any other argument to support her challenge to these findings.

---

[4] The commissioner adopted the ALJ's findings of fact.

During the administrative hearing, Gifford testified that she informed Whitehall that vaping was a risk to the children because there was potential for tobacco residue to reside on her clothing and person. Gifford also informed Whitehall that because Sprouts only employed nonsmoking teachers, she would need to quit vaping to remain working there. Substantial evidence supports finding of fact 8.

### B. Employs non-smoking employees

Whitehall also challenges finding of fact 10 that "Sprouts employs only non-smoking employees." The commissioner also augmented the finding, which Whitehall does not challenge. The complete finding states, "[Gifford] discharged [Whitehall] from employment on July 12, 2019, on the basis that Sprout[s] employs only non-smoking employees." The commissioner did not find as fact that every employee at Sprouts does not smoke. The commissioner found that Sprouts discharged Whitehall on the basis that its policy is to employ only non-smoking employees.

Sprouts' tobacco use policy states that "Sprouts hires only non-smoking employees . . ." Additionally, Gifford testified that Sprouts only employs non-smoking teachers. Gifford also testified at the administrative hearing that she reminded Whitehall of its policy to hire only non-smoking employees and explained that "she could choose whether she wanted to continue . . . working there and not continue the smoking [of] e-cigarettes or whether she wanted to continue smoking e-cigarettes and not continue working there." Substantial evidence supports finding of fact 10.

9

*C. Nicotine exposure*

Whitehall additionally challenges the commissioner's augmented finding that "[t]he owner determined the employer could not subject the children to ongoing risk of third hand nicotine exposure." Whitehall provides no argument that Gifford did not make this determination, nor does she advance any other argument to support her challenge to this finding. Gifford wrote in her July 12 email to Whitehall that "[Sprouts] employ[s] only non smoking/vaping teachers due to the risks of 3rd hand smoke for the children." Whitehall also testified as to her concern for such risk. Substantial evidence supports this finding.

Insofar as Whitehall appears to suggest that the commissioner made a finding of fact that e-cigarettes leaves residue and creates third-hand exposure to nicotine that could be harmful to the health of the children, the commissioner did not make such a finding.[5]

### Voluntary Quit

The legislature enacted the Employment Security Act[6] to award unemployment benefits to "persons unemployed through no fault of their own." Courtney, 171 Wn. App. at 660 (quoting RCW 50.01.010; Safeco Ins. Co. v. Meyering, 102 Wn.2d 385, 392, 687 P.2d 195 (1984)).

---

[5] We note that Whitehall herself testified that "vaping juice" "contains tobacco when you have a tobacco-flavored product." Whitehall also testified that she believed the smoke e-cigarettes emit "dissipates four times faster than smoking," but that she was "not saying that there aren't, like, tiny, microscopic traces."

[6] Title 50 RCW; RCW 50.01.005.

No. 83299-9-I/11

RCW 50.20.050(1)(a) provides, "A claimant shall be disqualified from benefits" when "the claimant left work voluntarily without good cause. . ." Whitehall does not address whether she had good cause to quit under the relevant statute.[7] Instead, she argues that the commissioner erred when the commissioner found that Whitehall voluntarily quit rather than being improperly discharged. We agree with the commissioner.

The phrase "left work voluntarily" in RCW 50.20.050 is a legal phrase determined by the facts of the case. Courtney, 171 Wn. App. at 661 (quoting Read v. Emp't Sec. Dep't, 62 Wn. App. 227, 233, 813 P.2d 1262 (1991)). The act requires the Department to analyze the facts of each case to determine what actually caused the employee's separation. Courtney, 171 Wn. App. at 661 (citing Safeco, 102 Wn.2d at 392-93). "Whether a worker voluntarily left or was discharged must be resolved on a basis of the worker's intent." Korte v. Emp't Sec. Dep't, 47 Wn. App. 296, 301, 734 P.2d 939 (1987) (citing Safeco, 102 Wn.2d at 392-93). "A voluntary termination requires a showing that an employee intentionally terminated her own employment or committed an act that the employee knew would result in discharge." Courtney, 171 Wn. App. at 661.

The Department cites to Courtney and Korte to support its position that Whitehall voluntarily quit her position. In Courtney, an employee returned from vacation learning that there had been a dispute and a co-owner had been

---

[7] Because the date of separation is July 12, 2019, a claimant who quit has good cause and is not disqualified from benefits only under the circumstances listed under RCW 50.20.050(1)(b). RCW 50.20.050 provides an exhaustive list of good cause reasons to quit—ability to vape not being one of them. A person who quits without good cause is disqualified from unemployment benefits for seven weeks, while a discharge for misconduct disqualifies a person for 10 weeks. RCW 20.50.050, 066.

removed from a management position, but that he was contesting his removal. Courtney, 171 Wn. App. at 658. The employee went into the office to retrieve her paycheck. Id. One of the new management members saw her on her way out of the office and let her know her job was safe and they still wanted her to work for them, giving her two days to decide. Id. The following week, she remained in contact with the removed co-owner and worked from home, but she did not speak to the new management. Id. The court held that she voluntarily quit her job, reasoning that Courtney's deliberate choice not to report to work under the new management demonstrated her intent to quit. Id. at 663. It explained that she "committed an act that [she] knew would result in discharge." Id. at 661. "[N]either RCW 50.20.050(2) nor case law requires a written distillation of intent or that intent be affirmatively expressed as distinguished from a failure to act." Id. at 661.

In Korte, the employer told the employee that an employment contract was nonnegotiable and a condition of continued employment. Korte, 47 Wn. App. at 297-98. The employee was given 72 hours to accept or reject the contract. Id. On the last day of the 72-hour period, the employee refused to sign and asked to continue negotiations. Id. The employer told the employee that if she did not sign the contract, she should leave her keys on her desk at 4 o'clock that afternoon. Id. Korte did not sign the contract and turned in her keys at the end of the work day. Id. Though the issue in Korte was whether the employee had good cause to quit, and not whether she quit, the Korte facts are still analogous to the instant case.

In both <u>Courtney</u> and <u>Korte</u>, the employer wanted the employee to continue employment, but the employee did not want to continue working under the employer's conditions. In <u>Courtney</u>, the employee had to work under new management. In <u>Korte</u>, the employee had to sign an employment contract. In both cases, the employee was given a deadline to decide. In <u>Courtney</u>, the employee's intent to quit was exhibited by not responding within the deadline. In <u>Korte</u>, the employee's intent to quit was exhibited by not signing the contract and leaving her keys.

Like the employees in <u>Courtney</u> and <u>Korte</u>, Whitehall had the option to continue employment upon a condition that Whitehall did not agree with. When Gifford told Whitehall her continued employment required her to refrain from using e-cigarettes, she testified that at first she agreed to quit using them out of fear of losing her job. When she later changed her mind, she did so with knowledge that she could no longer work at the childcare facility. Like the employees in <u>Courtney</u> and <u>Korte</u>, Whitehall made a choice that she knew did not comply with an employer condition that would result in job separation. Substantial evidence supports the commissioner's determination that the voluntary quit statute applied because "the claimant correctly understood that continuation of the employment relationship was contingent on her agreement to comply with a specified term of her employment. The decision was [Whitehall's] to make. Her definitive choice – that she would not comply – effectively initiated the job separation."

13

We reverse the superior court and reinstate the commissioner's decision that Whitehall voluntarily quit without good cause.

Availability for Work

Though our holding that Whitehall voluntarily quit is dispositive, we address the issue of whether Whitehall made herself available for work because the Department specifically cross-appealed this issue.  Whitehall contends that the commissioner erred by concluding Whitehall was not available to accept suitable work because she acknowledged she would need childcare.  The Department cross-appeals the superior court's reversal of the commissioner's determination that Whitehall was ineligible because she was not available for work.

The commissioner adopted and affirmed the ALJ's findings of fact and conclusions that she was not available for work.  The commissioner found that during the weeks that Whitehall claimed unemployment benefits, she was able to work at a suitable job and was actively seeking suitable work as required.  The commissioner additionally found that she had two children in her household ages four and five.  The commissioner observed that while Whitehall was working at Sprouts, she received an employee discount where she could bring her children to work with her, but Whitehall did not currently have any childcare arrangements in place since she separated from employment with Sprouts.  She enrolled in a master's program and classes would begin on September 25, 2019.

14

The commissioner concluded in light of these facts Whitehall was not in compliance with the requirements of RCW 50.20.010 and that she was ineligible for unemployment benefits.

RCW 50.20.010 provides benefit eligibility conditions. RCW 50.20.010(c)(i) specifically states that an unemployed individual shall be eligible to receive benefits with respect to any week in his or her eligibility period only if the commissioner finds that:

> (c) The individual is able to work, and is available for work in any trade, occupation, profession, or business for which the individual is reasonably fitted.
>> (i) To *be available for work, an individual must be ready, able, and willing, immediately to accept any suitable work which may be offered to him or her and must be actively seeking work pursuant to customary trade practices* and through other methods when so directed by the commissioner or the commissioner's agents. . .

(Emphasis added.) The Department regulations state in general, the Department will consider claimants available for work if they do not impose conditions that substantially reduce or limit their opportunity to return to work at the earliest possible time. WAC 192-170-010(1)(c). Claimants carry the burden to prove they have the right to benefits. Jacobs v. Off. of Unemployment Comp. & Placement, 27 Wn.2d 641, 651, 179 P.2d 707 (1947).

The Department contends that Whitehall put two restrictions on her availability for work—the fact that she enrolled in a master's program as a full-time student, and she did not have a childcare plan for her two minor children.

The Department misreads the record. RCW 50.20.095 disqualifies individuals from recovering benefits when they are enrolled in classes for 12 or

15

more hours unless an exception applies. The Department defines the period of disqualification to start "with the week the instruction begins." WAC 192-200-005(2). The ALJ expressly noted that because Whitehall was *not in school* during the claimed benefits weeks at issue, the fact that she was enrolled to begin school later is of no matter as indicated by the following exchange between the ALJ and Whitehall.

> JUDGE LOCKWOOD: Okay. All right. And so, um, while you've been claiming unemployment benefits, have you been in school?
>
> MS. WHITEHALL: No.
>
> JUDGE LOCKWOOD: Okay. So that doesn't kick in here –

In other words, Whitehall was claiming benefits for July 2019 through August 2019, and her master's program began in September 2019. Thus, the basis for the ALJ's conclusion that Whitehall was ineligible for benefits rested on her childcare situation, which the ALJ also questioned Whitehall about.

> JUDGE LOCKWOOD: Okay. And, uh, do you have a childcare plan organized so that you're available to look for work and take a job?
>
> MS. WHITEHALL: I do not at the moment.
>
> JUDGE LOCKWOOD: Okay. Um, what would you do, then, if some employer said, "Yes, I'd like to hire you, uh, starting tomorrow"?
>
> MS. WHITEHALL: Um, I would have to, like, figure out what the hours are. I mean, I've looked at a couple things, and there's, like, before and after programs and this and that, and it would just kind of depend on what the job is and what hours they're offering. Not every job offers, like, a Monday through Friday eight to five, and in childcare those are hard spots to get anyway, so it would just have to be kind of when I figured out a job that I can obtain and then kind of see, like, maybe I could do nights, maybe I could do weekends. Um, I'm not sure. So I can't preplan it because I don't know.

No. 83299-9-I/17

Gifford even came to Whitehall's defense regarding prearranging childcare. She told the ALJ,

> I would – I would just like to add, to support what she was saying, um, it would be expensive to enroll a child or two children into childcare before you have a job lined up. Um, so I just – I want to support that it definitely makes sense to not line up childcare until you know what your job is and your hours are, um, just being in that field. I don't know if that's helpful, but –

Whitehall acknowledged that she "might have to do childcare again" until she starts school in the fall.

The Department contends that "Whitehall was unavailable to immediately accept work because she lacked a childcare plan for her two minor children if she was offered work." The Department relies on two published commissioner decisions that have "consistently determined that a lack of childcare may constitute a substantial restriction." The Department cites In re Lininger, Emp. Sec. Comm'r Dec.2d 213, 1976 WL 183438 (1976) and In re Yeoman, Emp. Sec. Comm'r Dec.2d 1200, 1974 WL 177568 (1974).

The commissioner has authority to designate certain unemployment benefits decisions as precedent and to publish those decisions. Martini v. Emp. Sec. Dep't, 98 Wn. App. 791, 795, 990 P.2d 981 (2000); RCW 50.32.095. "Such precedents are persuasive authority in this court." Martini, 98 Wn. App. at 795.

In Lininger, the claimant had an epileptic son who also had various allergies. Lininger, 1976 WL 183438, at *1. The claimant missed work for a number of days when the son's babysitter would not keep the son because of the nature of his illness. Id. After the claimant was discharged for absenteeism, she

17

applied for unemployment benefits and was denied. Id. The commissioner concluded that the claimant had not actively sought work throughout the entire period in question. Id. at *3. The commissioner also addressed whether the claimant made herself available for work. During the course of a Department interview, the claimant stated that she had "not lined up a sitter yet but I believe that I can get my neighbor to take my boy from the Headstart class to the day care center." Id. at *1. The commissioner noted that the claimant was not directly questioned at the hearing as to when she obtained reliable childcare but noted that the claimant's notice of appeal stated it was the very next day. Id. The commissioner concluded that the lack of adequate care for her young son posed a substantial restriction on her immediate availability for work between the time she applied for benefits until the time she obtained reliable child care. Id. at *3.

In Yeoman, the claimant was a dinner or fry cook. Yeoman, 1974 WL 177568, at *1. She admitted she was not available for late swing shift or graveyard shift work because of her inability to find a suitable babysitter for her son during those hours. Id. at *2. The claimant also limited her availability to work geographically because of transportation issues. Id. The commissioner concluded that the claimant was not available for all shifts customary to her occupation, nor was she available throughout her labor market area. Id.

Unlike the claimant in Yeoman, nothing in the record establishes that Whitehall was not available for all shifts customary to her occupation or that she was not available throughout her labor market area. Unlike the claimant in

Lininger, Whitehall was actively seeking work. The commissioner found that "[d]uring the weeks the Claimant claimed unemployment benefits, the Claimant was able to work at a suitable job, and she was actively seeking suitable work as required."

As our Supreme Court observed in Jacobs, "No one prescribed set of factors can be compiled to govern every individual claimant in every situation, but each case depends largely upon its own peculiar facts and circumstances." Jacobs, 27 Wn.2d at 652.

At oral argument, the Department asserted that in Jacobs our Supreme Court also held that "a worker's family responsibilities or other personal circumstances do not excuse significant limitations on availability." Wash. Court of Appeals oral argument, Whitehall vs. Emp't Sec. Dep't, No. 83299-9-I (November 3, 2022), at 17 min., 54 sec. through 18 min., 07 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2022111120/?eventID=2022111120. However, in Jacobs, our Supreme Court determined that the claimant was unavailable for work because she restricted her job search to daytime employment, did not show she had suitable transportation if she was offered work, and did not show she was seeking work as required by statute. Jacobs, 27 Wn.2d at 660.

The commissioner in the instant case concluded that "the absence of a childcare plan for the Claimant's two minor children presents a significant impediment or limitation on the Claimant's ability to actively seek suitable

19

employment, and her availability for all customary hours of employment. As the Claimant candidly acknowledged, she was able to work at Sprouts in large part because discounted childcare was available to her."[8]

However, nothing in the record shows that not having a specific childcare plan impeded or limited Whitehall's ability to actively seek suitable employment or make her available for all customary hours of employment. Nothing in the record established that Whitehall was offered employment but turned it down because of a lack of childcare plan for the relevant period at issue. Despite having young children, Whitehall was willing to work days, evenings, and weekends. She was open to working in childcare again and she would have to "figure out" her childcare plan, but it "would just kind of depend on what the job is and what hours they're offering." While Whitehall did not have a specific plan, she was planning. She testified that she "looked at a couple things, and there's, like, before and after programs."

While certainly some people may be fortunate enough to know someone who could babysit at a moment's notice, that is the exception, not the norm. As Gifford explained, it is impractical for someone who cannot afford childcare while unemployed to spend money to arrange for childcare *prior* to gaining employment. To do so in order to qualify for unemployment defies logic. To expect someone to spend money to secure childcare on a schedule that may or may not coincide with future work hours, rewards those with the privilege to be

---

[8] The commissioner adopted the ALJ's conclusions of law related to the issue of availability for work.

able to do so while putting those who are likely in greater need of employment benefits at a disadvantage.

The commissioner's conclusion that Whitehall did not make herself available to work under RCW 50.20.010 is not supported by substantial evidence.

<u>Attorney Fees</u>

Whitehall requests attorney fees under RAP 18.1(a) and RCW 50.32.160, which provides for attorney fees if "the decision of the commissioner shall be reversed or modified." Because we affirm the commissioner's decision that she voluntarily quit without good cause, we decline to award fees.

CONCLUSION

We reverse the superior court and reinstate the commissioner's decision that Whitehall voluntarily quit without good cause. We also affirm the superior court's reversal of the commissioner's decision that Whitehall was ineligible for benefits under RCW 50.20.010(c)(i).

_____Coburn, J._____

WE CONCUR:

_____Díaz, J._____        _____Smith, A.C.J._____

21